## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                              No. CR-01-1670 MV

JOHN F. AGUILAR,

      Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant John F. Aguilar's Motion to Suppress **[Doc. No. 21]**, filed February 26, 2002. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is not well taken and will be **DENIED**.

### BACKGROUND

Late on the night of October 6, 2001, Deputy Sheriff Jeff Furbee was patrolling in downtown Roswell, New Mexico. At some point close to midnight, he began driving behind a white 1977 Chevrolet Monte Carlo in poor condition, later identified as Defendant's vehicle. Deputy Furbee observed that the sticker on Defendant's license plate was a different color from the sticker for the then current year, indicating that the license plate had expired. Deputy Furbee followed Defendant's vehicle with the intention of making a traffic stop because of the expired license plate.

At that point, Defendant turned into the parking lot of a Denny's restaurant and parked. Deputy Furbee did not engage his emergency equipment, but followed Defendant's vehicle and pulled

up behind it. Deputy Furbee testified that, upon observing Defendant slide across the seat to the passenger side,[1] he exited his vehicle and approached the Monte Carlo on the passenger side.

There is conflicting evidence regarding what happened next. According to Deputy Furbee's report of the incident and his testimony at the hearing, he made brief eye contact with Defendant, but as he approached and identified himself, Defendant ignored him, rolled up the window, slapped the lock down and slid back over to the driver's side. Deputy Furbee testified that he then walked around the back of Defendant's car to the driver's side. According to Deputy Furbee, Defendant continued to ignore him and started to crank up the window on the driver's side. Deputy Furbee testified that, at this point, he was becoming concerned about safety issues and, as a result, ordered Defendant to show him his hands. According to Deputy Furbee, he repeated this "a couple of times, loud," but Defendant ignored him. Deputy Furbee wrote in his report and testified at the hearing that Defendant continued to crank up the window with his left hand and started to reach under the seat with his right hand. According to Deputy Furbee, based upon his training, Defendant's action of reaching under the seat caused him concern about his safety, as Defendant's movements suggested that there might be a weapon under the seat. Because Deputy Furbee was concerned about his safety, he explained, he pulled on the door handle of Defendant's car and the door opened "rather quickly." According to Deputy Furbee, Defendant fell partially out of the car, losing his balance but not continuing all the way to the ground. According to Deputy Furbee, he grabbed Defendant's left hand, lifted him up and out of the car and handcuffed him. Deputy Furbee explained that he handcuffed Defendant for safety reasons.

---

[1] Deputy Furbee did not include in his report the fact that Defendant moved over to the passenger side of the car.

According to Defendant's testimony, once he pulled into the Denny's parking lot, he reached over to the passenger side to lock his door and "came back over" to the driver's side with a pair of pliers to roll up the driver's side window. Defendant testified that the only way to roll up the driver's side window or to open the driver's side door was with pliers, as both the handle for adjusting the window and the door handle were broken. According to Defendant, he did not see Deputy Furbee until he was in the process of rolling up the driver's side window with the pliers. Defendant testified that he looked to his left and saw Deputy Furbee standing next to the car on the driver's side, pointing a gun at him and yelling at him to show his hands. Defendant's testimony is inconsistent regarding precisely when he complied with this directive. At one point during the hearing, Defendant testified that he put his hands up as soon as he heard Deputy Furbee yell. At another point, Defendant testified that he heard Deputy Furbee yell, "show me your hands" and then continued to close the window "two more cranks" with the pliers until the window was fully closed and that it was not until the window was fully closed that he showed his hands. Later during the hearing, Defendant testified that he had already finished closing the window when he heard Deputy Furbee yell.

Defendant further testified that Deputy Furbee told him to open the car door, and that, in compliance, he reached over with his right hand and unlocked the door while he applied the pliers to the broken door handle with his left hand to open the door. According to Defendant, the only way to open the driver's side door was from the inside, as the outside handle was inoperative. Defendant testified that, just as he was opening the door from the inside, Deputy Furbee pulled on the door using the outside handle. According to Defendant, although he was the one who made the door open, the force that Deputy Furbee exerted in pulling on the door caused Defendant to lose his balance but not to fall all the way to the ground. According to Defendant, Deputy Furbee pulled him from the car

-3-

and asked whether he had any weapons and Defendant replied that he did not. Defendant testified that, as he was standing up, he locked the car door and shut it with his right elbow, keeping his hands up. Defendant testified that Deputy Furbee started "cussing, and saying the f— word." At that point, Defendant testified, Deputy Furbee told him to turn around and put his hands behind his back and placed him in handcuffs.

Deputy Furbee conducted a pat-down search of Defendant for weapons. He also asked for Defendant's license, registration and insurance. Defendant could not provide any of this documentation, and informed Deputy Furbee that he did not have a license. At the hearing, Defendant testified that his license had been suspended. According to Deputy Furbee, Defendant did not tell him his name. Deputy Furbee noticed a wallet in Defendant's pocket, and asked if he could check the wallet for Defendant's identification. According to Deputy Furbee, Defendant responded, "go ahead," or "okay," and Deputy Furbee took out Defendant's wallet and found an identification card therein revealing his name. According to Defendant, he told Deputy Furbee that he had an identification card in his wallet, took out the wallet himself and handed it to Deputy Furbee.

Deputy Furbee testified that he observed that Defendant's movements, as he was cranking up the car window, seemed "rather slow," and "lethargic," and that "his coordination seemed off." Further, Deputy Furbee testified that he observed that Defendant's eyes were red and bloodshot, that Defendant's speech was "a little bit slurred" and that, as soon as the car door was opened, he smelled a strong odor of alcohol. As a result of these observations, Deputy Furbee testified, he suspected that Defendant had been drinking and driving. According to Deputy Furbee, he asked Defendant if he had been drinking and Defendant replied that he had not. Deputy Furbee wrote in his report and testified at the hearing that he asked Defendant if he wanted to perform field sobriety tests, without specifying

what those tests were, and that Defendant said "no." According to Deputy Furbee, once Defendant refused the field sobriety tests, he placed Defendant under arrest for DWI and, along with Deputy Sheriff Charles Yslas, who arrived at the scene just after Deputy Furbee had placed Defendant in handcuffs, put Defendant in the back of his patrol car.

According to Defendant, Deputy Furbee did not ask him if he had been drinking and did not ask him whether he wanted to perform any field sobriety tests. Rather, Defendant testified that, after removing Defendant's keys from his pocket and placing them on the trunk of Defendant's car, Deputy Furbee told him that he was going to put him in his patrol car for safety reasons. According to Defendant, Defendant picked up his keys and put them back in his pocket, and Deputy Furbee grabbed them out of his hands and told him not to touch them. Defendant testified that Deputy Furbee then placed Defendant in the back of the patrol car.

Once Defendant had been put into Deputy Furbee's patrol car and, according to both Deputy Furbee and Deputy Yslas, had been placed under arrest, Deputy Furbee asked Deputy Yslas to conduct an inventory search of Defendant's car. Deputy Furbee informed Deputy Yslas that he had seen Defendant reaching down in the area of the floorboard of the driver's side of the car. Deputy Yslas testified that he conducted an inventory search of Defendant's car, beginning with the driver's side floorboard area. In that area, Deputy Yslas found a semiautomatic handgun. According to Deputy Yslas, he could not run a check on the serial number of the gun to determine whether it was stolen because the serial number had been scratched off or otherwise removed.

Deputy Yslas showed the gun to Deputy Furbee and advised him of what he had found. Deputy Furbee then asked Defendant about the gun. According to Deputy Furbee, Defendant told him either that he had no knowledge of the gun or that it was not his. Defendant's testimony

confirms that he told Deputy Furbee that the gun did not belong to him. According to Defendant, it was at this point that Deputy Furbee told him that he was going to be arrested for DWI.

According to both Deputy Furbee and Deputy Yslas, when he was shown the gun, Defendant became angry and attempted to kick the windows and door of the patrol car. At the hearing, Defendant admitted to this. Deputy Yslas testified that he physically restrained Defendant with "a bear-type hug." Deputy Furbee testified that he told Defendant that if he continued to kick the car, he would be charged not only with DWI but also with criminal damage, a felony charge, which would mean that he would go to prison rather than a county jail. According to Deputy Furbee, Defendant then calmed down.

At that point, Deputy Furbee took Defendant to the Chaves County Sheriff's Office in order to use the breath machine to measure the alcohol content of Defendant's breath. Deputy Furbee testified that he read to Defendant the New Mexico implied consent advisory, a copy of which is taped to the wall above the breath machine. Defendant similarly testified that Deputy Furbee read him the implied consent advisory and that he understood what was read to him. Further, Deputy Furbee testified that he asked Defendant to submit to a breath test, and that Defendant agreed. Defendant's testimony is consistent with this.

According to Deputy Furbee, however, Defendant blew "very small puffs of air" which were insufficient for the machine to register. Thereafter, Deputy Furbee testified, Defendant tried to break the thermometer off of the machine. Although he was still in handcuffs, Deputy Furbee stated that Defendant turned around, grabbed the thermometer and twisted it, and that Deputy Furbee pulled him

away before he was able to break it.[2] Deputy Furbee testified that, after the twenty-minute waiting period which is required between breath tests, he attempted to administer a second test. According to Deputy Furbee, Defendant put a coin into his mouth, which he swallowed, and then "belched." Deputy Furbee testified that, because burping can cause a change in the mouth alcohol level which would render the results of the breath test inaccurate, he stopped the test and did not take a breath sample. At that point, Deputy Furbee testified, he asked Defendant to consent to a blood test and Defendant refused to provide a blood sample. Upon Defendant's refusal, Deputy Furbee issued him a citation, charging him with aggravated driving under the influence of intoxicating liquor or drug.

According to Defendant, he blew into the machine and Deputy Furbee told him that his breath was insufficient and that he would have to do the test again. Defendant testified that, on the second attempt, Deputy Furbee "got mad" at him because he burped. According to Defendant, Deputy Furbee again read him the implied consent advisory, but that he did so very fast, that he only read portions of it, and that Defendant didn't understand what Deputy Furbee was saying. Defendant testified that he was confused about what was going on and that he was not instructed as to how a blood test would be administered. Defendant further testified that Deputy Furbee told him that he wanted both breath and blood tests and that he responded, "wait a minute, I already did your breath test." According to Defendant, Deputy Furbee "was mad" and said, "I want both." Defendant testified that he said, "no, wait a minute," and that, at this point, Deputy Furbee said, "I have you for aggravated DWI now." According to Defendant, he then said that he would take the blood test, but that Deputy Furbee said, "no, you already told me no, and that's it."

---

[2] Deputy Furbee's report does not include any statements regarding Defendant's alleged attempt to break the thermometer.

On December 13, 2001, a two-count Indictment was returned charging Defendant with felon in possession of a firearm and possession of a firearm which has had the serial number and other identification obliterated, removed, changed or altered. Thereafter, on February 26, 2002, Defendant filed the instant motion to suppress, seeking suppression of the firearm seized during the search of Defendant's car. The government filed its response in opposition on March 14, 2002. The Court held an evidentiary hearing on July 23, 2002 and September 5, 2002. At the conclusion of the hearing, the Court took Defendant's motion under advisement.

## **DISCUSSION**

Defendant argues that his arrest was unlawful. Further, Defendant argues that the search of his car was not conducted pursuant to a lawful arrest or for purposes of a lawful inventory search. As a result, Defendant concludes, the firearm seized from his car must be suppressed.

Defendant was arrested for DWI during a traffic stop. Accordingly, this Court must consider whether the initial stop and continued detention of Defendant were valid, whether probable cause arose during the detention warranting Defendant's arrest and whether the search of Defendant's car was a lawful inventory search. The Court addresses these issues in turn.

I.  Initial Stop and Further Detention

The Tenth Circuit explicitly has stated that "[s]topping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the detention is brief." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001). Accordingly, a routine traffic stop is "'subject to the constitutional imperative that it not be "unreasonable" under the circumstances.'" *Id.* (citations omitted). The reasonableness of a traffic stop, which "is an investigative detention analogous to a *Terry*

stop[,] . . . is evaluated in two respects: first, whether the officer's action was justified at its inception, and second, whether the action was reasonably related in scope to the circumstances that first justified the interference." *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994), *cert. denied*, 511 U.S. 1095 (1994).

Under the first prong of this test, a traffic stop is justified at its inception if "the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998). The Court's "sole inquiry is whether the particular officer had reasonable suspicion that the particular motorist violated 'any . . . of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (citation omitted).

In the instant case, Deputy Furbee observed that the sticker on Defendant's license plate was a different color from the sticker for the then current year, indicating that the license plate had expired. Under NMSA 1978 §66-3-18, no vehicle operated in New Mexico may display any registration plate, including tab or sticker, other than the one issued for the current registration period. This statutory provision further specifically prohibits the display of any expired registration plate, tab or sticker. *See Id.* Accordingly, Defendant was in violation of one of the "traffic and equipment regulations of the jurisdiction." *Hunnicutt*, 135 F.3d at 1348. Upon Deputy Furbee's observation of this violation, he was justified in stopping Defendant's vehicle.[3]

Under the second prong of this test, an "officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States*

---

[3] The Court finds that the analysis applicable to traffic stops is equally applicable here, where Defendant parked his car before Deputy Furbee was able to stop him.

*v. Arango*, 912 F.2d, 441, 446 (10th Cir. 1990), *cert. denied*, 499 U.S. 924 (1991). Once "the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning." *Id.* at 446. Additional questioning is permissible, however, if: "(1) 'during the course of the traffic stop the officer acquires an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity'; or (2) 'the driver voluntarily consents to the officer's additional questioning.'" *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997) (citation omitted)**.**

Several factors may contribute to the formation of a reasonable and articulable suspicion of illegal activity. The Tenth Circuit expressly has held that "[a]mong those factors that have justified further questioning are having no proof of ownership of the vehicle [and] having no proof of authority to operate the vehicle." *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998); *see also United States v. Villa-Chaparro*, 115 F.3d 797, 802 (10th Cir. 1997), *cert. denied*, 522 U.S. 926 (1997) ("'[one] recurring factor supporting a finding of reasonable suspicion . . . is the inability of a defendant to provide proof that he is entitled to operate the vehicle he is driving.'") (citation omitted). Another factor is driving with a suspended license. *See Hunnicutt*, 135 F.3d at 1349 (citing *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995)).

In the instant case, the government does not argue, and the Court does not find, that the initial detention became a consensual encounter. The Court, however, finds that there is credible evidence that Deputy Furbee had an objectively reasonable and articulable suspicion of illegal activity which warranted lengthening the detention. First, Defendant was driving without a license. Moreover, he had no proof that he was the vehicle's owner, no proof of insurance, no registration and no proof that he was otherwise authorized to operate the vehicle. Next, according to Deputy Furbee's written

report and testimony at the hearing, Defendant ignored him when he first approached on the passenger side of the car, closing the passenger side window and locking the passenger side door, and continued to ignore him when he came over to the driver's side of the car. Deputy Furbee testified that even after he had instructed Defendant to show his hands, Defendant continued to crank up the driver's side window with his left hand and started to reach under the seat with his right hand. Defendant's testimony regarding his cooperation with Deputy Furbee's instruction is inconsistent. Accordingly, the Court finds Deputy Furbee's testimony, which is consistent with his report, to be more credible. Defendant's delay in responding, his closing and locking of windows and doors and his action of reaching under the seat were sufficient to cause Deputy Furbee reasonable concern that Defendant might have stuffed a weapon or contraband under the seat. "Police officers need not close their eyes to suspicious circumstances." *Hunnicutt*, 135 F.3d at 1349. Given the totality of the circumstances here, Defendant's further detention was supported by a reasonable articulable suspicion of illegal activity.

II.   Probable Cause for Defendant' Arrest

Defendant contends that there was no basis for his arrest. The relevant issue is whether, during the legal detention of Defendant, Deputy Furbee developed probable cause that Defendant was driving while under the influence of alcohol. Under New Mexico law, "[a] police officer has probable cause when facts and circumstances within the officer's knowledge, or about which the officer has reasonably trustworthy information, are sufficient to warrant an officer of reasonable caution to believe that an offense is being committed or has been committed." *State v. Sanchez*, 131 N.M. 355, 358 (Ct. App.), *cert. denied*, 131 N.M. 382 (2001). Also under New Mexico law, "[i]t is unlawful for any person who is under the influence of intoxicating liquor to drive any vehicle within

-11-

the state." *Id.* (citing NMSA 1978 §66-8-102(A)).  A person is "under the influence" within the meaning of the statute "if 'as a result of drinking liquor [the driver] was less able to the slightest degree, either mentally or physically, or both, to exercise the clear judgment and steady hand necessary to handle a vehicle with safety to [the driver] and the public.'" *Sanchez*, 131 N.M. at 358 (citing UJI 14-4501 NMRA 2001).  Thus, in order to arrest an individual for driving under the influence, an officer needs to have "knowledge of facts sufficient to allow him or an objectively reasonable officer in his position, to conclude that [the individual] had been driving while he was 'to the slightest degree' unable to exercise the clear judgment and steady hand necessary to handle a vehicle in a safe manner." *Id.*

In *Sanchez*, the officer had first approached the defendant after the defendant had stopped at a roadblock and asked the defendant for his license, registration and proof of insurance.  Instead of a license, the defendant provided an identification card.  Further questioning revealed that the defendant was driving with a revoked license.  While talking to the defendant, the officer noticed that the defendant had a strong odor of alcohol on his breath and blood-shot, watery eyes.  The officer directed the defendant to pull over and exit his car so that he could administer field sobriety tests.  The defendant refused to consent to the field sobriety tests.  Upon this refusal, the officer placed the defendant under arrest for DWI.

The defendant appealed his conviction, contending that the officer lacked probable cause to arrest him for DWI because he did not exhibit signs of impaired driving.  The officer had conceded at trial that the defendant was not driving improperly and that the defendant would not have been stopped if not for the roadblock.  The New Mexico Court of Appeals affirmed, holding that where "[t]he officer observed that Defendant smelled of alcohol, and had blood-shot watery eyes . . . [a]n

-12-

objectively reasonable officer could take all of these factors into account in determining whether there was probable cause to make an arrest." *Id.* Moreover, the Court of Appeals held that an objectively reasonable officer "could logically infer from Defendant's refusal to consent to the field sobriety testing that Defendant knew he was driving under the influence of alcohol and that these tests might reveal his impairment." *Id.* This inference, the Court of Appeals concluded, "combined with the officer's other observations of Defendant, gave [the officer] probable cause to arrest Defendant for DWI." *Id.*

The facts of the instant case are indistinguishable from those in *Sanchez*.[4] The Court agrees with Defendant that the evidence does not show that Deputy Furbee observed anything in Defendant's driving to lead him to believe that Defendant might be driving while impaired. Nonetheless, during his lawful detention of Defendant, Deputy Furbee observed that Defendant's movements were slow and lethargic, that his coordination seemed off, that his eyes were red and bloodshot, that his speech was a little bit slurred and that he smelled strongly of alcohol. In addition, in both his report and his testimony, Deputy Furbee stated that Defendant refused to consent to field sobriety tests. Under *Sanchez*, the logical inference to be drawn from Defendant's refusal to consent to field sobriety tests, combined with Deputy Furbee's other observations of Defendant, gave Deputy Furbee probable cause to arrest Defendant for DWI.

At the hearing, Defendant offered alternative explanations for his bloodshot eyes, slurred speech and uncoordinated movements. Specifically, Defendant testified that he suffers from allergies that affect his eyes, that he has a speech impediment that causes him to slur his S's and R's, and that

---

[4] To the extent that Deputy Furbee's testimony and Defendant's testimony are in conflict, the Court finds Deputy Furbee's testimony to be more credible and thus relies on this testimony, in addition to Deputy Furbee's report, in making its determination.

the broken handles in his car require him to apply, with a jerky motion, a pliers to open and close his windows and doors.  While these explanations for what Deputy Furbee observed very well may be true, the question is whether Deputy Furbee's observations were sufficient to allow him or an objectively reasonable officer in his position to conclude that Defendant had been driving while he was 'to the slightest degree' unable to exercise the clear judgment and steady hand necessary to handle a vehicle in a safe manner.  Under the relevant case law, the Court must answer this question in the affirmative.

Defendant also contends that his arrest was improper because it was conducted on private property.  This contention is unsupported by the case law.  In *State v. Johnson*, 130 N.M. 6 (2000), the New Mexico Supreme Court addressed the issue of the geographical reach of the DWI statute.  The Supreme Court found that "Section 66-8-102 applies to private as well a public property, regardless of whether the intoxicated person is driving or in actual physical control of a vehicle." *Id.* at 11.  Accordingly, the fact that Deputy Furbee arrested Defendant for DWI in the Denny's parking lot does not render the arrest unlawful.

III.    The Search of Defendant's Car

Defendant contends that, because Deputy Furbee did not have probable cause to arrest Defendant, the search of Defendant's car following the arrest was unlawful.  As set forth above, however, Deputy Furbee had probable cause to arrest Defendant.  Both Deputy Furbee and Deputy Yslas testified that, once Defendant had been placed under arrest, Deputy Yslas conducted an inventory search of Defendant's car.  According to their testimony, Deputy Furbee informed Deputy Yslas that he had seen Defendant reaching down in the area of the floorboard of the driver's side of the car.  Deputy Yslas testified that he started his search in this area, where he found the gun.

"An inventory search is a well-defined exception to the warrant requirement of the Fourth Amendment, designed to effect three purposes: protection of the owner's property, protection of the police against claims of lost or stolen property, and protection of the police from potential danger." *United States v. Haro-Salcedo*, 107 F.3d 769, 772 (10th Cir. 1997) (citations omitted). In order to be reasonable, an inventory search must be "conducted according to standardized procedures." *Id.* Moreover, an inventory search is invalid if it is "a ruse for a general rummaging in order to discover incriminating evidence." *Id.* at 773.

In the instant case, the Chaves County Sheriff's Department has a policy and procedure which sets forth that an individual's vehicle is to be impounded following an arrest and that the deputy must conduct a complete and thorough inventory of the vehicle's contents and list the contents of the vehicle in the proper location on the department form. *See* Rule 12 of the Chavez County Department Policy. Deputy Yslas testified that he conducted an inventory search of Defendant's car in accordance with the department form. Defendant contends that, regardless of this testimony, the search of the car in fact was done for the improper purpose of discovering evidence of criminal activity, namely to determine whether there was a weapon hidden under the front seat.

Even if a search is conducted for investigatory rather than administrative purposes and thus cannot be characterized as an inventory search, suppression of evidence found during the search is not appropriate where the evidence nonetheless would be discovered. *See Haro-Salcedo*, 107 F.3d at 773. In *United States v. Horn*, 970 F.2d 728 (10th Cir. 1992), a Utah state trooper stopped the defendant because he noticed the absence of a front license plate, which was required in Utah, and noticed that the defendant did not appear to be wearing a seatbelt. During the stop, the trooper was informed by dispatch that there was a warrant for the defendant's arrest for a parole violation and that

he should use caution because the defendant was considered dangerous. The trooper requested backup and arrested the defendant at gunpoint. After the backup officer arrived, the defendant was detained, handcuffed and held at gunpoint while the trooper conducted a warrantless inventory search of the interior and the trunk of the defendant's car. During the search, the trooper found two firearms.

The defendant argued that the search did not fall within the boundaries of an impound inventory and thus was constitutionally infirm. The Tenth Circuit held: "[t]he question whether or not the trooper conducted a proper inventory search is moot. '[I]f evidence seized unlawfully would have been inevitably discovered in an subsequent inventory search, such evidence would be admissible.'" *Id.* at 732 (citing *United States v. Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992)). According to the Tenth Circuit, because the defendant was traveling alone and was placed under arrest, his car, of necessity, had to be impounded. The Tenth Circuit explained:

> Even assuming arguendo that the post-arrest search beside the highway was improper and should have been conducted in a different manner, had the search been conducted in the manner defendant suggests is proper, it was inevitable that the weapons would have been discovered and that defendant would have been charged with their possession. Under *Ibarra*, this evidence is admissible."

*Id.*

The same reasoning applies in this case. Defendant's car was lawfully impounded after his arrest. Chaves County policy department procedures mandate an inventory search to secure personal items found in a defendant's seized vehicle. A proper inventory search would have uncovered the gun in the front floorboard area of the car. Thus, even if the search at the scene was improper and should have been conducted in a different manner, "it was inevitable that the weapon[] would have

been discovered." *Id.* Accordingly, the inevitable discovery rule forecloses Defendant's argument that the gun seized from his car must be suppressed.

## CONCLUSION

Deputy Furbee's initial stop of Defendant was justified, as the license plate on Defendant's vehicle was expired. During the initial stop, Deputy Furbee developed reasonable suspicion of criminal activity warranting Defendant's continued detention. During this continued detention, Deputy Furbee developed probable cause that Defendant was driving under the influence of alcohol. Deputy Furbee lawfully arrested Defendant for DWI based upon probable cause that Defendant was driving under the influence of alcohol. After the arrest, Deputy Yslas conducted an inventory search of Defendant's car, discovering a gun during his search. Even if the search exceeded the boundaries of a warrantless inventory search, the gun inevitably would have been discovered during a properly conducted inventory search following impoundment of the car in accordance with police policy. Accordingly, Defendant's motion to suppress evidence seized from his car must be denied.

**IT IS THEREFORE ORDERED** that Defendant John F. Aguilar's Motion to Suppress **[Doc. No. 21]** is hereby **DENIED**.

Dated this 30th day of January, 2004.

_____
MARTHA VAZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

<u>Attorney for Plaintiff</u>:
Roberto Ortega

<u>Attorney for Defendant</u>:
Roger Finzel